Richard F. Holley, Esq. (NV Bar No. 3077)
Email: rholley@nevadafirm.com
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
Email: oatamoh@nevadafirm.com
SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101
Telephone:    702/791-0308
Facsimile:    702/791-1912
*Attorneys for Debtor*

E-Filed: July 10, 2009

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

In re:

NOVEMBER 2005 LAND INVESTORS, LLC,

Debtor.

Case No. BK-S-09-17474-MKN
Chapter 11

**MOTION FOR ORDER AUTHORIZING DEBTOR-IN-POSSESSION SUPER-PRIORITY FINANCING UNDER 11 U.S.C. § 364(c)(1)**

Date of Hearing:    August 19, 2009
Time of Hearing:    9:30 a.m.
Place: Courtroom No. 2, Third Floor
       Foley Federal Building
       300 Las Vegas Blvd., S.
       Las Vegas, NV 89101

Judge: Hon. Mike K. Nakagawa

November 2005 Land Investors, L.L.C, a Nevada limited liability company, the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Debtor" or "November 2005"), respectfully requests an order under 11 U.S.C. § 364(c) authorizing the Debtor to obtain debtor-in-possession financing ("DIP Financing") from NLV 2009 Investors L.L.C. (the "DIP Lender") pursuant to that certain "Debtor-In-Possession Financing Agreement" (the "DIP Loan Agreement"). A copy of the DIP Loan Agreement is attached to the "Declaration of Douglas Hensley In Support of Motion to Approve Super-Priority Debtor-In-Possession Financing" (the "Hensley DIP Loan Declaration") as Exhibit "1."

This "Motion For Order Authorizing Debtor-In-Possession Super-Priority Financing Under 11 U.S.C. § 364(c)(1)" (the "Motion" or "DIP Financing Motion") is supported by: (i) the

QB\135686.00002\8363452.3

attached Memorandum of Points and Authorities; (ii) the Hensley DIP Loan Declaration; (iii) the DIP Loan Agreement; (iv) the "Omnibus Declaration of Douglas W. Hensley" filed June 11, 2009 (the "Omnibus Hensley Declaration") [Docket No. 59]; and (iv) the entire record before the Court in the Reorganization Case (defined below).

DATED this 10th day of July, 2009.

        SANTORO, DRIGGS, WALCH,
        KEARNEY, HOLLEY & THOMPSON

*/s/ Richard F. Holley*
Richard F. Holley, Esq. (NV Bar No. 3077)
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101

*Attorneys for Debtor*

- 2 -

QB\135686.00002\8363452.3

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. JURISDICTION AND VENUE.

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. The Motion presents a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2) over which the Court has authority to enter a final order. The predicate for the relief requested in this Motion is 11 U.S.C. § 364 and the Motion is governed by Rule 4001 of the Federal Rules of Bankruptcy Procedure. Venue in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

### II. INTRODUCTION AND BACKGROUND.

1. The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 8, 2009 (the "Petition Date"), in the United States Bankruptcy Court for the District of Nevada (the "Reorganization Case").

#### The Project

2. November 2005 is in the business of developing a 2,675 acre master-planned community in North Las Vegas known as Park Highlands ("Park Highlands" or the "Project") which is more fully described in the Omnibus Hensley Declaration, which is incorporated by this reference.

#### The Debtor

3. The Debtor is a limited liability company which has only one member, NLV Holding L.L.C. ("Holding"). The ownership structure of Holding is more particularly described in the Omnibus Hensley Declaration, which is incorporated by this reference and will not be repeated here. As of the Petition Date, Holding (through its members) has invested approximately $199 million in the Debtor. Holding's members have purchased approximately 417 acres for purposes of developing subdivisions, for a cumulative purchase price of $222 million.

#### The Secured Debt Encumbering the Project

4. In May of 2006, the Debtor borrowed $410 million secured by the Project and guaranteed by Holding. The secured debt is structured as follows: there is a $280 million term

- 3 -

QB\135686.00002\8363452.3

loan (the "First Lien Term Loan") and a $50 million line of credit (the "First Lien Line of Credit") which are each secured by a *pari passu* first lien against the Project (collectively, the "First Lien Debt"); there is also an $80 million term loan secured by a second lien in the Project (the "Second Lien Debt")(collectively referred to as the "Loans").[1]

5. Both the First Lien Debt and the Second Lien Debt are syndicated. Credit Suisse Securities (USA) L.L.C. served as the syndication agent for the First Lien Debt and the Second Lien Debt. The participants in the syndicates vary from time to time because the debt was traded. At the present time, there are approximately 36 lenders that own interests in the First Lien Debt and the Second Lien Debt (collectively, the "Lenders"). Credit Suisse, Cayman Islands Branch ("Credit Suisse"), serves as the administrative and collateral agent for the First Lien Debt but has recently resigned as the agent for the Second Lien Debt. Wilmington Trust FSB has replaced Credit Suisse as the agent for the Second Lien Debt ("Wilmington"). Both the First Lien Debt and the Second Lien Debt have been extended and amended pursuant to various agreements. The First Lien Debt and the Second Lien Debt are also subject to an intercreditor agreement.

6. Since the inception of the Loans, the Debtor has paid down the principal owed on the First Lien Debt by approximately $179 million. As of the Petition Date, the balances due on the Loans (including any unpaid interest and other charges) were as follows: First Lien Term Loan - $101,454,091; First Lien Line of Credit - $43,321,052; Second Lien Term Loan - $80,597,305.

**The Problems Faced by the Debtor Prepetition**

7. The Debtor is facing two primary challenges. First, the co-developer on the Project, DRHI Inc. (a subsidiary of homebuilder DR Horton)("DRHI"), has defaulted under its agreements with the Debtor by, among other things, failing to pay its share of infrastructure costs and transferring its interest in the Project without the Debtor's consent. The Debtor and certain

---

[1] Hereinafter references to the documents evidencing the First Lien Debt will be referred to as the "First Lien Credit Documents" and the documents evidencing the Second Lien Debt will be referred to as the "Second Lien Credit Documents."

- 4 -

QB\135686.00002\8363452.3

other parties filed suit against DRHI and its parent, D.R. Horton, in May of 2008, which is presently pending in Clark County District Court. As of the Petition Date, the Debtor had experienced at least $5.9 million in damages as a result of DRHI's failure to perform. The Debtor is presently in discussions regarding resolving the problems related to DRHI's actions.

8. The second and primary problem faced by the Debtor is the result of the extraordinary downturn in the economy in general and the Las Vegas real estate market in particular. Simply put, the Debtor's business model is premised on homebuilders purchasing parcels within the Project to construct and sell new homes. Homebuilders have not been purchasing parcels, closing on pending purchases or constructing new homes because of the recession in the Las Vegas real estate market. This has delayed the Project, and prevented the Debtor from being able to pay the Loans in accordance with their terms. Nevertheless, the Debtor continues to believe that the Project remains viable as the economy begins to recover.

9. The Debtor, in consultation with its financial and legal advisors, determined that a restructuring the First Lien Debt and the Second Lien Debt obligations was necessary for the Debtor's continued operations and would be in the best interests of its creditors and other stakeholders.

10. The Debtor therefore engaged in intensive pre- and post- petition negotiations with Credit Suisse, and the Lenders for a restructure of the First Lien Debt and the Second Lien Debt. These negotiations resulted in a proposed restructuring of the Loans ("Proposed Loan Restructure") that was reflected in a restructuring term sheet and amendments to the credit agreements.

11. But, as discussed more fully in the Omnibus Hensley Declaration, under the terms of the Loan Agreements the proposed restructuring of the terms of the First Lien Debt and the Second Lien Debt requires unanimous approval of the syndicate participants. In addition, inaction by a lender participant (i.e., failure to cast a vote on a proposed restructure) is considered a "no" vote under the First Lien Credit Documents and the Second Lien Credit Documents.

QB\135686.00002\8363452.3

12. Although there was very strong support for the Proposed Loan Restructure, the Debtor was unable to achieve timely unanimous consent. Accordingly it was not possible to implement the Proposed Loan Restructure out of court.

### The Reorganization Case and the DIP Loan

13. The Debtor's goal in filing the Reorganization Case is to implement the Proposed Loan Restructure, as it has been modified and negotiated after the filing of the Reorganization Case, through a plan of reorganization that will result in the Debtor's ability to reorganize its financial affairs, bring new equity into the reorganized entity and continue its operations of developing the Project.

14. Since the filing of this Reorganization Case, the Debtor continued negotiations with the Lenders in order to address issues that certain of the Lenders had with the Proposed Loan Restructure. Those negotiations have resulted in the "Agreement For Adequate Protection, For Settlement And For Plan Treatment" dated as of July 2, 2009 (the "Settlement Agreement") which sets forth, among other things, the terms of the loan restructurings that, as of July 6, 2009, had been approved and accepted by 73.03% in number of the First Lien Lenders who hold 74.15% of the total amount of the obligations owing to the First Lien Lenders and 58.30% in number of the Second Lien Lenders who hold 52.55% of the total amount of the obligations owing to the Second Lien Lenders.[2]

15. Under the terms of the Settlement Agreement, the Debtor is obligated to begin making adequate protection payments to the First Lien Lenders equal to the amount of interest that would otherwise be payable under the First Lien Credit Documents (the "Adequate Protection Payments").

16. In order to be able to pay the Adequate Protection Payments and to fund ongoing administrative expenses, the Debtor has negotiated debtor-in-possession financing (the "DIP

---

[2] See Declaration Of Douglas W. Hensley In Support Of Debtor's Motion For Order Approving Agreement For Adequate Protection, For Settlement And For Plan Treatment filed in support of the motion to approve the Settlement Agreement filed contemporaneously with the DIP Financing Motion.

QB\135686.00002\8363452.3

1  Loan") with NLV 2009 Investors L.L.C. (the "DIP Lender").  The terms of the DIP Loan are
2  highly favorable to the estate:

- Loan Amount.  Under the DIP Loan, the DIP Lender will make a $8,000,000 term loan available to the Debtor.
- Interest.  6% per annum, compounded monthly, calculated on a 360 day year.
- Term.  The earlier of November 30, 2009, the effective date of a plan of reorganization, or termination by written notices as a result of an event of default.
- Payments.  The DIP Loan is due and payable in full upon maturity so there will be no payment during the pendency of the Reorganization Case.
- Equity Conversion.  The DIP Lender has the option to convert the DIP Loan to equity on the effective date of the Debtor's plan of reorganization.[3]
- Super-priority Administrative Expense.  Subject to a carve-out for court approved professional fees, the DIP Lender will be granted a super-priority administrative claim under 11 U.S.C. § 364(c)(1).
- Covenants.  The Debtor is required to comply with an agreed budget, the form for submission of which is attached to the DIP Loan Agreement (the "Budget").
- Carve-Out.  The DIP Lender's super-priority administrative claim is subordinate to a carve-out totaling $650,000, which may be used to pay quarterly fees under 28 U.S.C. § 1930, any fees payable to the Clerk of the Bankruptcy Court and subject to the Budget and court approval under 11 U.S.C. § 330, and 331 and allowed fees and expenses of professionals appointed by the Bankruptcy Court under 11 U.S.C. § 327.
- Subordination.  Pursuant to the Settlement Agreement and the DIP Loan Agreement, the DIP Lender has agreed to subordinate its right to payment until the First Lien Debt and the Second Lien Debt are paid in full.

---

[3] Assuming a plan of reorganization consistent with the terms of the Settlement Agreement is confirmed and becomes effective, it is the intent that the DIP Loan will be converted to indirect equity in the Reorganized Debtor.

- 7 -

QB\135686.00002\8363452.3

### III. **LEGAL ARGUMENT**.

Bankruptcy Code § 364 sets out the procedure by which a debtor-in-possession ("DIP") may obtain post-petition credit. 11 U.S.C. § 364; *In re Sun Runner Marine, Inc.*, 945 F.2d 1089, 1092-93 (9th Cir. 1991); Alan N. Resnick & Henry J. Sommer, Collier on Bankr. ¶ 364.01 (15th Rev. Ed. 2006); *see also In re LPM Corp.*, 300 F.3d 1134, 1138 n. 3 (9th Cir. 2002). Pursuant to 11 U.S.C. § 364(c), among other things, the DIP may obtain credit on a super-priority basis if the DIP is unable to obtain unsecured credit allowable just as an administrative expense. To obtain lending approval, the DIP typically must show that: (i) it is unable to obtain unsecured credit under § 364(b); (ii) the credit transaction is necessary; and (iii) the terms of the transaction are fair, reasonable, and adequate in light of the circumstances of the debtor and the proposed lender. *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494 (Bankr. D.N.M. 2002) (citing *In re Crouse*, 71 B.R. 544, 549 (E.D. Penn. 1987)); Collier on Bankr. ¶ 364.04(1).

In this case, all of the following factors support interim and final approval of the proposed DIP Loan:

- The transaction is necessary for the Debtor to continue its operations and accomplish its plan of reorganization in accordance with the proposed restructure.

- The DIP Loan does not disturb the rights of the First Lien Lenders and the Second Lien Lenders.

- As set forth in the Hensley DIP Loan Declaration, the Debtor cannot obtain unsecured financing or other financing on better terms. Specifically the Hensley DIP Loan Declaration reflects, among other things, that the Debtor evaluated possible alternative sources of financing and determined that there are no sources that would lend money without requiring current payments, requiring the probable payment of closing fees, and agreeing to an unsecured loan, even on a super-priority basis, with the required subordination to the Loans pursuant to the Settlement Agreement.

. . .

- 8 -

- The terms of the transaction are inexpensive, and the carve-out for administrative expenses fair to creditors.

IV. **CONCLUSION**.

Based on the foregoing, the Debtor respectfully requests that the Court enter an Order:

1. Granting the relief requested in this Motion;

2. Authorizing and approving the DIP Loan Agreement on the terms and conditions contained in this Motion and in the DIP Loan Agreement;

3. Granting NLV 2009 Investors, L.L.C. a super-priority administrative claim pursuant to 11 U.S.C. § 364(c)(1) having priority over any and all administrative expenses of the kinds specified in 11 U.S.C § 503(b) or 507(b), subject to the Carve-Out and the subordination to the First Lien Debt and the Second Lien Debt; and

4. Granting the Debtor such other and further relief as the Court deems just under the circumstances.

DATED this 10th day of July, 2009.

**SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON**

*/s/ Richard F. Holley*

Richard F. Holley, Esq. (NV Bar No. 3077)
Ogonna M. Atamoh, Esq. (NV Bar No. 7589)
400 South Fourth Street, Third Floor
Las Vegas, Nevada 89101

*Attorneys for Debtor*

QB\135686.00002\8363452.3