1  Richard F. Holley, Esq. (NV Bar No. 3077)
   Email: rholley@nevadafirm.com
2  Ogonna M. Atamoh, Esq. (NV Bar No. 7589)                    E-filed on: July 17, 2009
   Email: oatamoh@nevadafirm.com
3  SANTORO, DRIGGS, WALCH,
   KEARNEY, HOLLEY & THOMPSON
4  400 South Fourth Street, Third Floor
   Las Vegas, Nevada 89101
5  Telephone:    702/791-0308
   Facsimile:    702/791-1912
6  *(Proposed) Attorneys for Debtor*

7

8                  **UNITED STATES BANKRUPTCY COURT**

9                          **DISTRICT OF NEVADA**

10  In re:                                    Case No. BK-S-09-17474-MKN
                                              Chapter 11
11  NOVEMBER 2005 LAND INVESTORS,
    L.L.C.,
12
                    Debtor.
13
                                              Date of Hearing:      August 19, 2009
14                                            Time of Hearing:      9:30 a/m.
                                              Place: Courtroom No. 2, Third Floor
15                                                                  Foley Federal Building
                                                                    300 Las Vegas Blvd., S.
16                                                                  Las Vegas, NV 89101

17                                            Judge: Hon. Mike K. Nakagawa

18          **DISCLOSURE STATEMENT TO ACCOMPANY DEBTOR'S PLAN OF**

19                             **REORGANIZATION**

20

21

22

23

24

25

26

27

28

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

# TABLE OF CONTENTS

DISCLAIMER ............................................................................................................................. 2
I.    INTRODUCTION ............................................................................................................. 3
    A.    Ballots and Voting ...................................................................................................... 6
    B.    Hearing on Confirmation and Objections ................................................................... 6
II.    BACKGROUND AND HISTORY OF THE DEBTOR ..................................................... 7
    A.    History of Debtor, its Structure and Ownership. ........................................................ 7
    B.    Debtor's Business Operations and Pre-Bankruptcy Events. ....................................... 8
        1.    Business Operations. ........................................................................................ 8
        2.    Disputes with DRHI and DR Horton ............................................................... 9
        3.    Prepetition Funding For The Project. ............................................................. 10
        4.    Business Downturn And Attempts At Out of Court Restructuring. ............... 13
        5.    The Filing Of the Reorganization Case And Continued Negotiations With Lenders... 14
    C.    Actions and Proceedings during the Reorganization Case. ....................................... 15
        1.    Employment of Professionals. ....................................................................... 16
        2.    Section 341 General Meeting of Creditors. ................................................... 17
        3.    Motion to Set Bar Date. ................................................................................. 17
        4.    Motion to Approve Agreement for Debtor-in-Possession Post-Petition Financing. .... 18
        5.    Motion to Approve Agreement for Adequate Protection, for Settlement and for Plan Treatment. ........................................................................................................................... 19
    D.    Pre Petition Litigation. ............................................................................................. 21
    E.    Post Petition Litigation. ........................................................................................... 21
    F.    Avoidance Actions .................................................................................................. 21
        1.    Preference Actions ......................................................................................... 21
        2.    Other Avoidance Actions. .............................................................................. 22
III.    OVERVIEW OF DEBTORS' DEBTS AND CLAIMS ................................................. 22
    A.    Secured Creditors ..................................................................................................... 22
        1.    First Lien Lenders ........................................................................................... 22
        2.    Second Lien Lenders. ..................................................................................... 23
    B.    Priority Creditors ..................................................................................................... 23
    C.    Unsecured Creditors. ................................................................................................ 23
IV.    GENERAL SUMMARY OF PLAN. ............................................................................. 23
    A.    Unclassified claims .................................................................................................. 27
    B.    Classified Claims ..................................................................................................... 29
        1.    Class 1-Prepetition Date Secured Tax Claims. .............................................. 30
        2.    Class 2-First Lien Lenders. ............................................................................ 31
        3.    Class 3-Second Lien Lenders. ........................................................................ 32
        4.    Class 4-General Unsecured Convenience Claims. ......................................... 32
        5.    Class 5-General Unsecured Claims. ............................................................... 33
        6.    Class 6-Penalty Claims. ................................................................................. 34
        7.    Class 7-Membership Interests. ....................................................................... 34
V.    MEANS OF IMPLEMENTING THE PLAN. ................................................................ 34
    A.    Transactions to Occur Prior to the Effective Date. .................................................. 34
        1.    Other Occurrences On The Effective Date. ................................................... 34
        2.    Post Effective Date Management And Ownership Of The Reorganized Debtor. ........ 35
    B.    Procedure for Determination of Claims ................................................................... 35
        1.    Objections to Claims. ..................................................................................... 35
        2.    Disputed Claims. ............................................................................................ 35
        3.    Treatment of Contingent Claims ................................................................... 36
        4.    Setoffs. ........................................................................................................... 36
        5.    Payments Effective Upon Tender. ................................................................. 36
        6.    Valuation of Collateral. .................................................................................. 37



SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES. .................................. 37
VII.   EFFECT OF CONFIRMATION ........................................................................... 39
   A.  Binding Effect. ............................................................................................. 39
   B.  Vesting of Assets. ......................................................................................... 39
   C.  Discharge of Debtor and Termination of Membership Interests. ................... 40
   D.  Term of Pre-Confirmation Injunctions or Stays. .......................................... 40
   E.  Injunction. .................................................................................................... 40
   F.  Exculpation and Limitation of Liability. ...................................................... 42
   G.  Injunction Related to Releases, Exculpation and Interference with Plan. ...... 42
   H.  Termination of Subordination Rights and Settlement of Related Claims......... 43
   I.  Release of Liens. .......................................................................................... 43
   J.  Retention of Causes of Action/Reservation of Rights. .................................. 44
   K.  Release of Selling First Lien Lenders and Selling Second Lien Lenders. ........ 45
VIII.  CONFIRMATION PROCEDURE .................................................................... 46
   A.  Solicitation of Votes. .................................................................................... 46
IX.    Acceptance. ...................................................................................................... 46
X.     Fair and Equitable Test:  Cram Down. ........................................................... 47
XI.    Best Interest of Creditors and Liquidation Analysis. .................................. 48
   A.  Feasibility. ..................................................................................................... 51
XII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION .................. 51
OF THE PLAN. ........................................................................................................... 51
   A.  Alternative Plans for Reorganization. ........................................................... 52
   B.  Liquidation Under Chapter 7. ....................................................................... 52
XIII.  CERTAIN FEDERAL TAX CONSEQUENCES .................................................. 53
XIV.   DEBTOR'S RECOMMENDATION. ................................................................ 54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

ii

## DISCLAIMER

THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THIS DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE COURT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN OF REORGANIZATION OF THE DEBTOR AND DEBTOR-IN-POSSESSION, AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CLAIMS AND INTEREST HOLDERS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS WILL BE CORRECT AT ANY SUBSEQUENT TIME. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN WILL GOVERN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH BANKRUPTCY CODE § 1125 AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

1    WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

2    THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR

3    DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR

4    HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE

5    STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.    PERSONS OR

6    ENTITIES TRADING IN, OR OTHERWISE PURCHASING, SELLING, OR

7    TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTOR, OR ANY OF ITS

8    AFFILIATES SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN

9    IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

10    AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER

11    ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT WILL NOT

12    CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY,

13    STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN

14    SETTLEMENT NEGOTIATIONS.    THIS DISCLOSURE STATEMENT WILL NOT BE

15    ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE

16    CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER

17    LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY

18    INTERESTS IN, THE DEBTOR, OR ANY OF ITS AFFILIATES, DEBTOR AND DEBTOR-

19    IN-POSSESSION IN THIS CASE.

20                              **I.    INTRODUCTION**

21    Debtor submits this Disclosure Statement pursuant to § 1125 of the United States

22    Bankruptcy Code, 11 U.S.C. §101, et seq. (the "Bankruptcy Code"), to creditors (collectively

23    "the Creditors") in connection with: (i) the solicitation from Creditors of votes on the Plan filed

24    with the Bankruptcy Court; and (ii) the hearing on confirmation of the Plan (the "Confirmation

25    Hearing").    UNLESS OTHERWISE DEFINED IN THIS DISCLOSURE STATEMENT, ALL

26    CAPITALIZED TERMS WILL HAVE THE MEANINGS ASCRIBED TO THEM IN THE

27    PLAN.  A copy of the Plan is attached to this Disclosure Statement as **Exhibit "1."**

28                                            - 3 -

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

THIS DISCLOSURE STATEMENT IS NOT THE PLAN OR A PLAN SUPPLEMENT. THIS DISCLOSURE STATEMENT AND THE PLAN, AS WELL AS ALL ADDITIONAL REFERENCED EXHIBITS, SHOULD BE READ IN THEIR ENTIRETY.    FOR THE CONVENIENCE OF CREDITORS THE PLAN IS SUMMARIZED IN THIS DISCLOSURE STATEMENT.    THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN ITSELF, WHICH IS CONTROLLING IN THE EVENT OF ANY INCONSISTENCY. IF YOU HAVE ANY QUESTIONS REGARDING THIS DISCLOSURE STATEMENT, THE PLAN, ANY EXHIBITS, OR THE PROCEDURES FOR VOTING FOR ACCEPTANCE OF THE PLAN, YOU MAY CONTACT DEBTOR'S BANKRUPTCY COUNSEL:    RICHARD F. HOLLEY, ESQ. OF SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON, 400 SOUTH FOURTH STREET, THIRD FLOOR, LAS VEGAS, NEVADA 89101, TELEPHONE (702) 791-0308, OR VIA FACSIMILE AT (702) 791-1912.    INTERESTED PARTIES MAY ALSO OBTAIN FURTHER INFORMATION FROM THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEVADA AT ITS WEBSITE: http:/www.nvb.uscourts.gov.

The purposes of this Disclosure Statement are as follows:

(a)    provide adequate information to enable a hypothetical reasonable investor typical of the holders of claims or interests in the case to make an informed judgment about the Plan;

(b)    set forth information regarding the history of the Debtor, the filing of the Chapter 11 Petition, the Plan and Plan alternatives;

(c)    advise Creditors of their rights and to assist them in making an informed decision regarding whether to accept the Plan; and

(d)    assist the Bankruptcy Court in making an informed decision regarding whether the Plan complies with the requirements of the Bankruptcy Code.

No post-petition solicitation of votes on the Plan may be made except pursuant to this Disclosure Statement and no person has been authorized to utilize any information concerning

- 4 -

1   the Debtor other than the information contained in this Disclosure Statement for purposes of

2   solicitation.

3       APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY

4   COURT DOES NOT MEAN THAT THE BANKRUPTCY COURT RECOMMENDS

5   ACCEPTANCE OR REJECTION OF THE PLAN.

6       THE STATEMENTS AND INFORMATION CONCERNING THE DEBTOR SET

7   FORTH IN THIS DISCLOSURE STATEMENT CONSTITUTE THE ONLY STATEMENTS

8   OR INFORMATION CONCERNING SUCH MATTERS THAT HAVE BEEN APPROVED

9   BY THE BANKRUPTCY COURT FOR THE PURPOSE OF SOLICITING ACCEPTANCES

10  OR REJECTIONS OF THE PLAN.  THE STATEMENTS AND INFORMATION ABOUT

11  THE DEBTOR AND THE FINANCIAL INFORMATION OF DEBTOR INCLUDING ALL

12  FINANCIAL PROJECTIONS AND INFORMATION REGARDING CLAIMS CONTAINED

13  IN THE DISCLOSURE STATEMENT, HAVE BEEN PREPARED FROM DOCUMENTS

14  AND INFORMATION OBTAINED BY THE DEBTOR.   CERTAIN ESTIMATES,

15  ASSUMPTIONS AND PROJECTIONS MAY BE MATERIALLY DIFFERENT FROM

16  ACTUAL FUTURE RESULTS.    THERE CAN BE NO ASSURANCES THAT ANY

17  FORECASTED OR PROJECTED RESULTS CONTAINED IN THIS DISCLOSURE

18  STATEMENT WILL BE REALIZED AND ACTUAL RESULTS MAY BE MATERIALLY

19  DIFFERENT FROM THOSE SHOWN.  DEBTOR IS UNABLE TO AND DOES NOT

20  WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THIS

21  DISCLOSURE STATEMENT IS WITHOUT ERROR.

22      THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE

23  MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER

24  TIME IS SPECIFIED. NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT

25  NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN WILL

26  UNDER ANY CIRCUMSTANCES CREATE AN IMPLICATION THAT THERE HAS BEEN

27  NO CHANGE IN THE INFORMATION SET FORTH IN THE DISCLOSURE STATEMENT

28

- 5 -

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SINCE THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE ON WHICH MATERIALS RELIED UPON IN PREPARATION OF THIS DISCLOSURE STATEMENT WERE COMPILED.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN. NOTHING CONTAINED IN THIS DISCLOSURE STATEMENT CONSTITUTES AN OMISSION OF ANY FACT OR LIABILITY BY ANY PARTY OR IS CONCLUSIVE EVIDENCE OF TAX OR OTHER LEGAL EFFECTS OF THE REORGANIZATION OF THE DEBTOR ON HOLDERS OF CLAIMS.

A.    Ballots and Voting

After carefully reviewing this Disclosure Statement, including the exhibits, each Creditor who is entitled to vote should use the enclosed Ballot. If a Creditor has a Claim in more than one Class entitled to vote on the Plan ("Voting Class"), the Creditor should obtain a separate Ballot for each Claim and vote each Claim separately.

TO BE COUNTED, A CREDITOR'S BALLOT MUST BE COMPLETELY FILLED IN, SIGNED AND RECEIVED BY DEBTOR'S COUNSEL ON OR BEFORE _____, 2009. ANY BALLOTS RECEIVED WHICH DO NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN, OR WHICH INDICATE BOTH ACCEPTANCE AND REJECTION OF THE PLAN, WILL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

Please complete and return your Ballot(s) to: Santoro, Driggs, Walch, Kearney, Holley & Thompson, Attention: Richard F. Holley, Esq., 400 South Fourth Street, Third Floor, Las Vegas, NV 89101, or via facsimile at (702) 791-1912, or via email at rholley@nevadafirm.com.

B.    Hearing on Confirmation and Objections

The Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2009, at _____ before the Honorable Mike K. Nakagawa, of the United States Bankruptcy Court, 300 Las Vegas Boulevard South, Courtroom No. 2, Las Vegas, Nevada 89101. Bankruptcy

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

1  Code § 1128(b) provides that a party-in-interest may object to confirmation of a plan. Any

2  objections to confirmation of the Plan must be in writing and specify in detail the name and

3  address of the objector, the grounds for the objection and the amount of the Claim of the

4  objector. Any Plan confirmation objection must be filed with the Bankruptcy Court and served

5  on counsel for the Debtor, Richard F. Holley, Esq., Santoro, Driggs, Walch, Kearney, Holley &

6  Thompson, 400 South Fourth Street, Third Floor, Las Vegas, Nevada 89101. The Confirmation

7  Hearing may be adjourned from time to time by the Bankruptcy Court without further notice

8  except for the announcement of the adjournment date made at the Confirmation Hearing or any

9  subsequently adjourned Confirmation Hearing.

10  At the Confirmation Hearing the Bankruptcy Court will: (i) determine whether the Plan

11  has been accepted by the requisite majorities of each Voting Class; (ii) determine all objections

12  to the Plan and to Confirmation of the Plan; (iii) determine whether the Plan meets the

13  requirements for Confirmation of the Plan; (iv) determine whether the Plan meets the

14  requirements of the Bankruptcy Code and has been proposed in good faith; and (v) confirm or

15  refuse to confirm the Plan.

16  **II.    BACKGROUND AND HISTORY OF THE DEBTOR**

17  A.    History of Debtor, its Structure and Ownership.

18  November 2005 Land Investors, L.L.C. ("November 2005" or "Debtor") is a Nevada

19  limited liability company and the debtor and debtor in possession in the above-entitled Chapter

20  11 case (the "Reorganization Case") having filed its voluntary Reorganization Case on May 8,

21  2009 (the "Petition Date").

22  November 2005 was formed on October 11, 2005, for the purpose of acquiring, together

23  with DRHI, Inc. ("DRHI") through a Co-Buyer Acquisition Agreement, the project which

24  consisted of approximately 2,675 gross acres, in North Las Vegas, Nevada, sold at an auction

25  held by the United States Bureau of Land Management ("BLM") on November 16, 2005 (the

26  "Property"). The Property is known as Park Highlands (the "Project" or "Park Highlands").

27

28

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

1   Immediately following the closing of the transaction with the BLM in May 2006, DHRI acquired

2   twenty percent (20%) of the Property.

3       The Debtor's sole member is NLV Holding, L.L.C., a Nevada limited liability company

4   ("Holding"). The current members of Holding and each of their respective percentage interests

5   in Holding are: AWH North, LLC ("AWH North") (25%), McCormick North, L.L.C.

6   ("McCormick North") (25%), Olympia NLV Associates, LLC ("Olympia NLV") (25%) and

7   Standard Pacific of Las Vegas, Inc. ("SPLV") (25%). Pursuant to the Operating Agreement of

8   November 2005, Summerset Development Services, L.L.C., a Nevada limited liability company

9   ("Summerset"), is the manager of November 2005 and is also the project manager for the Project.

10  The sole member of Summerset is Olympia Land Corporation ("Olympia Land"). The managers

11  of Summerset are Garry V. Goett (who is also the chairman/ president of Summerset), Guy

12  Inzalaco and R. Brett Goett. Douglas W. Hensley is the chief financial officer of Summerset and

13  the person designated by Summerset to act on behalf of Summerset with respect to its duties on

14  behalf of the Debtor. A wire diagram depicting the ownership and management of November

15  2005 is attached as **Exhibit "2"**.

16      B.      Debtor's Business Operations and Pre-Bankruptcy Events.

17          1.      Business Operations.

18      Park Highlands will be a master-planned community in North Las Vegas which, when

19  originally acquired, consisted of 2,675 gross acres that includes roadway segments and other

20  public lands. When the road segments and other public lands are removed from the calculation

21  of acres, there are approximately 1,947 net acres in the Project. Park Highlands is comprised of

22  two separate parcels consisting of approximately 600 acres (the "600-acre Parcel") and

23  approximately 2000 acres (the "2000-acre Parcel"), respectively. The 2000-acre Parcel is

24  partially bisected by the I-215 beltway alignment. Park Highlands has been designed to have

25  more than 425-acres of parks and recreational areas, including nine themed parks and a 300-acre

26  nature preserve, featuring four trailheads. November 2005 is to develop the infrastructure in Park

27  Highlands (including the parks and recreational areas) and certain other related amenities and

28

- 8 -

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

1   then sell parcels to homebuilders who will, in turn, construct homes to be sold to the public. The

2   current zoning at the Project allows for 15,750 residential units and for commercial development.

3        As of the Petition Date, infrastructure improvements had been commenced on a portion

4   of the 600-acre Parcel. In addition, land use and zoning entitlements for the Project have been

5   obtained.

6        2.    Disputes with DRHI and DR Horton

7        In conjunction with development of the Project, November 2005, DRHI, Summerset and

8   certain other parties entered into an Amended and Restated Infrastructure Funding Agreement,

9   dated as of March 1, 2006, as further amended by the Majority Consent & First Amendment to

10  the Amended and Restated Infrastructure Funding Agreement, dated as of December 31, 2007

11  (as amended, the "IFA"). Pursuant to the IFA, Summerset has the responsibility to coordinate

12  and oversee the engineering, planning, permitting, development and construction of the on-site

13  and off-site water, electrical, telephone, arterial roadways and other capital improvements of the

14  Project. November 2005 and DRHI are responsible for funding 80% and 20%, respectively, of

15  the infrastructure costs of the Project in accordance with the IFA, through payment to an

16  infrastructure escrow account established at Fidelity National Title Insurance Company (the

17  "IFA Account").

18       DRHI has not funded the contributions to the IFA Account for which it was responsible

19  for January through March 2008, October, 2008, and February through May 2009. The

20  contributions that DRHI has failed to fund total at least $4.9 million, and include without

21  limitation outstanding cash calls under the IFA that DRHI failed to fund through May 2009 plus

22  accrued interest thereon, outstanding real estate taxes and accrued interest thereon and costs of

23  collection and accrued interest thereon. As a result of DRHI's breach of the IFA, on May 28,

24  2008, November 2005 and Summerset filed a complaint against DRHI and DR Horton in the

25  Eighth Judicial District Court, Clark County, Nevada, for breach of contract and other claims,

26  including failure to pay amounts properly due and owing to the Debtor and Summerset, Case No.

27  A563880 (the "DRHI Litigation"). As of the date of this Disclosure Statement, the amounts

28

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

- 9 -

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

1    owed by DRHI and DR Horton on account of the defaults described above and other damages

2    caused by DRHI and DR Horton has not been finally determined (and is ongoing), but is at least

3    $5.9 Million.

4         DRHI and DR Horton have answered the complaint and the action was pending as of the

5    Petition Date.   In addition, DRHI and DR Horton filed a counterclaim against Summerset

6    whereby DRHI and DR Horton are seeking an accounting of the amounts which are claimed to

7    be owing.

8         Additionally, on or about September 30, 2008, DRHI purported to sell all of its interest in

9    the Project to Hillwood without the knowledge or consent of the Debtor, as required under

10   various agreements between DRHI and the Debtor.  The Debtor is presently in discussions with

11   Hillwood regarding a resolution of the claims that November 2005 and Summerset have against

12   DRHI and DR Horton as described above, as well as the claims arising from the unauthorized

13   transfer of the property previously owned by DRHI.  If a resolution is reached, the settlement

14   will be brought before the Bankruptcy Court for approval in the Reorganization Case and/or

15   incorporated into the Plan and approved as part of the confirmation process.  If there is no

16   resolution, it is the Debtor's intent to actively pursue its claims against DRHI and DR Horton

17   and to determine the best way to proceed with respect to Hillwood and the unauthorized transfer

18   of the property.

19          3.      Prepetition Funding For The Project.

20        Prior to the Petition Date, November 2005 received its funding from four primary sources

21   in order to acquire the Property from the BLM and fund the development costs, including, but

22   not limited to, construction of the infrastructure that occurred prior to the Petition Date:  capital

23   investment from Holding;[1] property sales from the Project; other income related to the operation

24   and development of the Project; and financing from certain lenders as discussed in more detail

25   below.  As of the Petition Date, Holding (through capital contributions from the Members) has

26   invested approximately $199 million in the Debtor.

---

[1] The source of funds for Holding that were, in turn, invested in November 2005, came primarily from the Members.

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

With respect to financing obtained by the Debtor from third parties, on or about May 9, 2006, November 2005, as borrower, Holding, as guarantor, certain banks and other financial institutions or entities as lenders (the "First Lien Lenders"), Credit Suisse, Cayman Islands Branch, as administrative agent for the First Lien Lenders and as collateral agent for the First Lien Lenders (the "First Lien Agent"), and Credit Suisse Securities (USA) LLC, as syndication agent for the First Lien Lenders, entered into that certain Credit Agreement, dated as of May 9, 2006 (the "Original First Lien Credit Agreement"), whereby the First Lien Lenders provided November 2005 with a term loan facility in the original principal amount of $280,000,000 and a revolving loan facility in the original principal amount of $50,000,000 (collectively, the "First Lien Loans").

The Original First Lien Credit Agreement has been amended as follows: (i) Amendment No. 1 (First Lien), dated as of December 21, 2007 and effective as of December 31, 2007 (the "First Lien Amendment"), (ii) Waiver and Amendment No. 2 to First Lien Credit Agreement, effective as of December 17, 2008 (the "First Lien Waiver"), (iii) Extension and Waiver Agreement (First Lien), effective as of February 27, 2009 (the "First Extension Agreement (First Lien)"), (iv) Second Extension and Waiver Agreement (First Lien), effective as of March 31, 2009 (the "Second Extension Agreement (First Lien)"), and (v) Third Extension and Waiver Agreement (First Lien), effective as of April 30, 2009 (the "Third Extension Agreement (First Lien)". Hereafter, when referred to together, the Original First Lien Credit Agreement, the First Lien Amendment, the First Lien Waiver, the First Extension Agreement (First Lien), the Second Extension Agreement (First Lien) and the Third Extension Agreement (First Lien) will be referred to as the "First Lien Credit Agreement".

In addition to the financing provided by the First Lien Lenders, November 2005, as borrower, Holding, as guarantor, certain banks and other financial institutions or entities as lenders (the "Second Lien Lenders"), Credit Suisse, Cayman Islands Branch, as administrative agent for the Second Lien Lenders and as collateral agent for the Second Lien Lenders (the

- 11 -

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

"Second Lien Agent")[2], and Credit Suisse Securities (USA) LLC, as syndication agent for the Second Lien Lenders, entered into that certain Credit Agreement dated as of May 9, 2006 (the "Original Second Lien Credit Agreement"), whereby the Second Lien Lenders provided the Borrower with a term loan facility in the original principal amount of $80,000,000 (the "Second Lien Loans").

The Original Second Lien Credit Agreement has been amended as follows: (i) Amendment No. 1 (Second Lien), dated as of December 21, 2007 and effective as of December 31, 2007 (the "Second Lien Amendment"), (ii) Waiver and Amendment No. 2 to Second Lien Credit Agreement, effective as of December 17, 2008 (the "Second Lien Waiver"), (iii) Extension and Forbearance Agreement (Second Lien), effective as of February 27, 2009 (the "First Extension Agreement (Second Lien)"), (iv) Second Extension and Forbearance Agreement (Second Lien), effective as of March 31, 2009 (the "Second Extension Agreement (Second Lien)"), and (v) the Third Extension and Forbearance Agreement (Second Lien), effective as of April 30, 2009 (the "Third Extension Agreement (Second Lien)". Hereafter, when referred to together, the Original Second Lien Credit Agreement, the Second Lien Amendment, the Second Lien Waiver, the First Extension Agreement (Second Lien), the Second Extension Agreement (Second Lien), and the Third Extension Agreement (Second Lien), will be referred to as the "Second Lien Credit Agreement". Also, when the First Lien Loans and the Second Lien Loans are referred to collectively, they will be referred to as the "Loans."

The First Lien Lenders and the Second Lien Lenders are each part of a separate syndicate of lenders who hold their respective interests in the First Lien Loans and the Second Lien Loans. Notwithstanding that there are approximately thirty-six (36) lenders who own or control various interests in the Loans and for whom there is an applicable First Lien Agent and Second Lien Agent, each of the First Lien Lenders and Second Lien Lenders is a "lender" under the First Lien

---

[2] Prior to the Petition Date, the Second Lien Agent resigned and was replaced by Wilmington Trust FSB. Hereinafter references to the Second Lien Agent shall mean and include Wilmington Trust FSB after its appointment as the Second Lien Agent.

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

Credit Agreement and under the Second Lien Credit Agreement. Therefore, each Lender has a right to vote to accept the Plan in each such Lenders' respective Class.

Finally, with respect to property sales which occurred at the Project prior to the Petition Date, in May 2006 each of the Members entered into purchase agreements with November 2005 whereby the Members would collectively purchase from November 2005 a total of 565 acres of the Project. At various times between May 2006 and the Petition Date, the contracts were amended (including all amendments, the "Purchase Contracts"). The first phase of the purchases totaling 417 acres closed on December 12, 2006, leaving the second phase, consisting of 148 acres, to be closed in three subsequent phases (the "Remaining Purchases"). The purchase price for the 417 acres was $222 million, the respective portion of which was paid to November 2005 by each of the Members with respect to the acreage purchased by each of the Members. The time to consummate the Remaining Purchases has been extended at various times. Amendments to the Remaining Purchases are part of the comprehensive restructure which form, in part, the Plan and which are the subject of the Amended and Restated Purchase Contracts (discussed below).

Since the inception of the Loans, November 2005 has made principal reductions in the amount due on the First Lien Loans of approximately $179 million. As of the Petition Date, the balances due on the Loans (including any unpaid accrued interest and other charges) were as follows: First Lien Term Loan $101,454,091; First Lien Revolver: $43,321,052; and Second Lien Term Loan: $80,597,305.

4.      Business Downturn And Attempts At Out of Court Restructuring.

Unfortunately, November 2005 was not immune from the unprecedented downturn in the economy and the severe housing recession which has hit the Las Vegas market particularly hard. Because November 2005 is dependent upon homebuilders to purchase parcels in the Project, the ability of the Project to proceed on schedule was severely impaired. The inability of homebuilders to purchase parcels in the Project together with DRHI's continuing defaults under the IFA, have, in turn, impacted the Debtor's ability to pay its debts as they became due,

- 13 -

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

1    including, payments due on the Loans.  Notwithstanding the current economic environment,

2    November 2005, Holding and other related entities remain committed to the Project and believe

3    that the Project remains very viable as the economy recovers.  As noted above, the Members

4    have made significant investments in the Project from their own funds.[3]

5        In light of the economic downturn and recession in the housing market, the Debtor began

6    discussions with the First Lien Lenders and the Second Lien Lenders last year regarding a

7    restructuring of the Loans.  The First Lien Credit Agreement and the Second Lien Credit

8    Agreement each require unanimous approval by each of the respective First Lien Lenders and

9    Second Lien Lenders for the proposed restructuring.  Inaction by a lender (i.e., failure to cast a

10   vote on a proposed restructuring) is considered a "no" vote under the First Lien Credit

11   Agreement and the Second Lien Credit Agreement, as applicable.  Although the proposed

12   restructuring that was presented to the Lenders ("Lenders" collectively refers to First Lien

13   Lenders and Second Lien Lenders) and which was the subject of substantial negotiations from

14   the first of the year through early May had very strong lender support from both the First Lien

15   Lenders and the Second Lien Lenders, for a variety of reasons, there was not unanimous

16   approval from either the First Lien Lenders or the Second Lien Lenders.

17        5.    The Filing Of the Reorganization Case And Continued Negotiations With

18            Lenders.

19        November 2005 filed the Reorganization Case in order to provide a mechanism by which

20   November 2005 can reorganize and restructure its obligations in a way that is materially

21   consistent with the restructuring proposal that forms the basis of the Adequate Protection

22   Agreement (discussed in Section II, C(5) below).  In accordance with the Debtor's agreement

23   with the Consenting Lenders (as defined below), the Amended and Restated Credit Agreements

24   (which are attached as Exhibits "1" and "2" to the Plan), form the basis for the treatment of the

25   First Lien Lenders' Secured Claims and the Second Lien Lenders' Secured Claims.  Although

26   November 2005 and the Lenders were unable to reach unanimous agreement on an out of court

27   [3]  Moreover, other related entities are committing to invest additional funds as part of the Plan.

28                                          - 14 -

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

1    restructuring, since the Petition Date, the Debtor continued to work with representatives of many

2    of the First Lien Lenders and Second Lien Lenders in order to address any issues or concerns

3    that had been raised to various provisions of the proposed out of court restructuring.

4         Those concerns have been addressed with a significant number of the Lenders as

5    evidenced by the Adequate Protection Agreement and the number of Lenders who have agreed to

6    the Adequate Protection Agreement.[4] It is the mutual desire and intent of the Debtor, Holding,

7    the related entities who will be funding the Plan and, as evidenced by the support for the

8    Adequate Protection Agreement, the First Lien Lenders and the Second Lien Lenders[5] to move

9    forward quickly to propose and confirm the Plan and have November 2005 emerge from the

10   Reorganization Case as a reorganized, viable entity.

11        C.    Actions and Proceedings during the Reorganization Case.

12        November 2005 currently operates as a debtor-in-possession.  As of this writing, no

13   committee of unsecured creditors has been formed in the Reorganization Case because the

14   United States Trustee's Office did not receive sufficient interest from unsecured creditors to

15   form a committee.  The Bankruptcy Court has certain supervisory powers over November 2005's

16   operations during the pendency of its Reorganization Case.  The Bankruptcy Court's powers are

17   generally limited to reviewing and ruling upon any objections asserted by a party-in-interest to

18   business operations and proposed transactions of the Debtor.  Except as otherwise authorized by

19   the Bankruptcy Court, the Debtor is required to give notice of any transactions not in the

20   ordinary course of business and of the compromise of any controversy to parties in interest who

21   request such notice.  In addition, the Bankruptcy Court supervises the employment of attorneys,

22   . . .

23

24   [4] As of the date of the Disclosure Statement, the Adequate Protection Agreement has been executed by 75.28% in
number of the First Lien Lenders who hold 83.29% of the total amount of the obligations owing to the First Lien

25   Lenders.  As of the date of the Disclosure Statement, the Adequate Protection Agreement had also been executed by
58.30% in number of the Second Lien Lenders who hold 52.55% of the total amount of the obligations owing to the

26   Second Lien Lenders.

27   [5] This includes even those First Lien Lenders and Second Lien Lenders who, for whatever reason, did not execute
the Adequate Protection Agreement.

28

- 15 -

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

1    accountants, and other professionals.  Significant events during the Reorganization Case are set

2    forth below:

3                        1.        Employment of Professionals.

4            On May 26, 2009, the Debtor filed the Application for Order Approving Employment of

5    Santoro, Driggs, Walch, Kearney, Holley & Thompson ("Santoro Firm Application"), as general

6    bankruptcy counsel [Dkt. No. 21].  The hearing on the Santoro Firm Application was held on

7    June 24, 2009 at 9:30 a.m.  The Order approving the Santoro Firm Application was entered by

8    the Court on June 30, 2009 [Dkt. No. 72].

9            On May 26, 2009, the Debtor filed the Application to Employ Valtus Capital Group

10   ("Valtus Application") as Financial Advisor [Dkt. No. 30].  The hearing on the Valtus

11   Application was held on July 1, 2009 at 9:30 a.m.  The Order approving the Valtus Application

12   was entered by the Court on July 9, 2009 [Dkt. No. 78 ].

13           On May 29, 2009, the Debtor filed the Application to Employ Latham & Watkins LLP as

14   Special Counsel ("LW Application") [Dkt. No. 33].   Latham & Watkins has represented

15   November 2005 in, among other things, the negotiations and documentation of the First Lien

16   Credit Agreement and the Second Lien Credit Agreement, and the forms of the Amended and

17   Restated Credit Agreements.  The hearing on the LW Application was held on July 1, 2009 at

18   9:30 a.m.  The Order approving the LW Application was entered by the Court on July 9, 2009

19   [Dkt. No. 79 ].

20           On June 2, 2009, the Debtor filed the Application to Employ Snell & Wilmer as Special

21   Counsel ("S&W Application") [Dkt. No. 38].  S&W has represented November 2005 in, among

22   other things, providing (i) analysis and advice regarding Nevada law and local governmental

23   authority ordinances and regulations governing development, land use, contract and related

24   matters concerning the real property owned by the Debtor; and (ii) Nevada legal opinions

25   concerning the enforceability of financing for the Debtor's project and recorded restrictions and

26   contractual obligations governing or affecting the use of the Debtor's property.  The hearing on

27   . . .

28

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

SANTORO  DRIGGS  WALCH
KEARNEY  HOLLEY & THOMPSON

SDW

1   the S&W Application was held on July 1, 2009 at 9:30 a.m.  The Order approving the S&W

2   Application was entered by the Court on July 9, 2009 [Dkt. No. 80 ].

3        On June 3, 2009, the Debtor filed the Application to Employ Goold, Patterson, Ales &

4   Day as Special Counsel ("Goold Patterson Application") [Dkt. No. 41].  Goold Patterson has

5   represented November 2005 in, among other things, revising development declarations with each

6   separate owner of property within Park Highlands and amending and restating the master

7   CC&R's recorded against the property to reflect the necessary changes in such documents and

8   the project since these documents were originally drafted with reference to the master planned

9   community, Park Highlands, for which Debtor is the "Declarant." The hearing on the Goold

10  Patterson Application was held on July 1, 2009 at 9:30 a.m. The Order approving the Goold

11  Patterson Application was entered by the Court on July 9, 2009 [Dkt. No. 81 ].

12            2.      Section 341 General Meeting of Creditors.

13       The Section 341 General Meeting of Creditors was held on June 11, 2009 and concluded

14  the same day.

15            3.      Motion to Set Bar Date.

16       On June, 11, 2009, the Debtor filed a Motion for Entry of an Order Establishing Bar

17  Dates for Filing Proofs of Claim and Approving the Form, Manner and Sufficiency of Notice

18  Thereof (the "Bar Date Motion") [Dkt. No. 58].  Pursuant to the Bar Date Motion, the Debtor

19  requested that the Court establish (1) a bar date by which all creditors other than governmental

20  units must file proofs of claim in the above-captioned Reorganization Case (the "General Bar

21  Date"); (2) a bar date by which all governmental units (as defined in 11 U.S.C. § 101(27)) must

22  file proofs of claim in the above-captioned case (the "Governmental Unit Bar Date"); (3) a bar

23  date by which all proofs of claim relating to the Debtor's rejection of executory contracts must

24  be filed in this case (the "Rejection Bar Date"); (4) a bar date by which all creditors must file

25  proofs of claim in this case as a result of amendments to Debtor's schedule of assets and

26  liabilities (the "Schedules Bar Date" and, together with the General Bar Date, the Governmental

27  Unit Bar Date and the Rejection Bar Date, will collectively be referred to as the "Bar Dates");

28

- 17 -

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

1    and (5) approve the form and manner of notice of the Bar Dates (the "Bar Date Notice") and

2    finding that the proposed notice of the Bar Dates to creditors and equity interest holders in the

3    form and manner requested is fair, reasonable, and adequate.

4        The Bar Date Motion was filed in light of the aggressive deadlines and schedule agreed

5    to by the Debtor in the Adequate Protection Agreement which will enable the Debtor to emerge

6    quickly from the Reorganization Case as a reorganized, viable entity.  Pursuant to the Adequate

7    Protection Agreement,[6] the Debtor has committed to the following schedule:  filing the Plan no

8    later than July 17, 2009; hearing on the Disclosure Statement within 30 days thereafter (subject

9    to the Court's schedule); hearing on confirmation of the Plan within 60 days after entry of the

10   order approving the Disclosure Statement (subject to the Court's schedule); and the effective

11   date of the Plan to occur by October 31, 2009 or, at the latest, November 30, 2009.

12       The hearing on the Bar Date Motion was held on July 1, 2009 at 9:30, a.m.  The Order

13   approving the Bar Date Motion was entered by the Court on July 7, 2009 [Dkt. No. 75 ] (the

14   "Bar Date Order".  The Debtor has sought a modification of the Bar Date Order to eliminate the

15   requirement that the Debtor publish notice of the Bar Date in the Wall Street Journal. [Dkt. No.

16   92] (the "Modification Motion").  The Modification Motion was heard on July 17, 2009 at 9:30

17   a.m. and approved by the Bankruptcy Court.

18           4.    Motion to Approve Agreement for Debtor-in-Possession Post-Petition

19               Financing.

20       On July 10, 2009, the Debtor filed its Motion to Approve Agreement for Debtor-in-

21   Possession Post-Petition Financing ("DIP Financing Motion"). [Dkt. No. 89]  Pursuant to the

22   Motion, the Debtor seeks authorization of the DIP Loan Agreement in order to borrow from

23   NLV 2009, as lender, up to $8 million to pay certain costs and expenses of the Debtor during the

24   course of the Reorganization Case, including, without limitation, the payments to be made by

25   Debtor to the First Lien Lenders for adequate protection under the Adequate Protection

---

26   [6] The hearing to approve the Adequate Protection Agreement is set for August 19, 2009.  Although the Adequate
     Protection Agreement has not been approved by the Bankruptcy Court, November 2005 intends to proceed in

27   accordance with the agreed schedule in the Adequate Protection Agreement.

28                                      - 18 -

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

1    Agreement. The DIP Loan will be an unsecured superpriority loan pursuant to Bankruptcy Code

2    § 364(c) and subordinated in all respects to the claims of the First Lien Lenders and the Second

3    Lien Lenders (including payment in full to the First Lien Lenders and the Second Lien Lenders).

4    The DIP Loan Agreement includes a carve out of $650,000 for Professional Fees incurred during

5    the course of the Reorganization Case and quarterly U.S. Trustee fees. The DIP Lender under

6    the DIP Loan is NLV 2009. NLV 2009 will also be a new member of New NLV upon the

7    Effective Date. Consequently, assuming that the Plan is confirmed, NLV 2009 will convert the

8    DIP Loan to equity in New NLV.

9          Hearing on the DIP Financing Motion is scheduled for August 19, 2009 at 9:30 a.m.

10              5.     Motion to Approve Agreement for Adequate Protection, for Settlement
        and for Plan Treatment.

11

12          On July 10, 2009, the Debtor filed its Motion for Order Approving Agreement for

13    Adequate Protection, for Settlement and for Plan Treatment ("Adequate Protection Motion)[Dkt.

14    No. 86]. Pursuant to the Motion, the Debtor seeks approval of a compromise with certain banks,

15    financial institutions and other entities ("Consenting Lenders"), as set forth in the Adequate

16    Protection Agreement, that will, among other things: (i) provide for adequate protection

17    payments to all of the First Lien Lenders (regardless of whether they are Consenting First Lien

18    Lenders or not); (ii) settle the First Lien Claims and the Second Lien Claims; and (iii) facilitate

19    the confirmation and consummation of the Plan and other transactions in the Reorganization

20    Case. The Plan will implement and incorporate the Amended and Restated Credit Agreements

21    negotiated by the parties which will be the treatment of the Claims of the First Lien Lenders and

22    the Second Lien Lenders under the Plan.

23          In the Adequate Protection Agreement, the Debtor agrees to payment of adequate

24    protection payments (including any interest payments not paid prior to the Petition Date) to the

25    First Lien Agent on behalf of the First Lien Lenders in an amount equal to the monthly interest

26    payment due to the First Lien Lenders pursuant to the terms of and at the rate set forth in the

27    First Lien Credit Agreement (the "Adequate Protection Payments") through the Effective Date,

28                                 - 19 -

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

1   without reference to default interest.   If the Debtor confirms a Plan that incorporates and

2   implements the Amended and Restated Credit Agreements, the Debtor will receive a credit

3   against the amount of Adequate Protection Payments and interest paid on or after March 1, 2009

4   under the terms of the existing First Lien Credit Agreement, to the extent the Debtor paid interest

5   in an amount greater than it would have been required to pay under the Amended and Restated

6   Credit Agreements for the same type of loan and for the same period as if the effective date of

7   the Amended and Restated Credit Agreements had been March 1, 2009.   After the Effective

8   Date, the Reorganized Debtor will be entitled to offset such excess amount against the interest

9   due and payable on the first interest payment under the Amended and Restated Credit

10   Agreements after the Effective Date.

11       The Amended and Restated Credit Agreements provide for the restructure of the First

12   Lien Loans and the Second Lien Loans in a manner that will relieve the Debtor of approximately

13   $21 million in First Lien Loans and $26 million in Second Lien Loans.   In addition to having the

14   Plan incorporate the terms of the Amended and Restated Credit Agreements, the Debtor will do

15   such other acts as are necessary in order to implement the Amended and Restated Credit

16   Agreements through the Plan.   In consideration of the various covenants and agreements as more

17   fully set forth in the Adequate Protection Agreement, Debtor also agrees not to act in any manner

18   materially inconsistent with the Amended and Restated Credit Agreements.

19       Conversely, the Consenting Lenders have agreed to support[7] a plan of reorganization

20   implementing and incorporating the material terms of the Amended and Restated Credit

21   Agreements after the Debtor's presentation of a court-approved Disclosure Statement so long as

22   _____

[7] The Consenting Lenders have not and will not, however, vote on the Plan until after receiving a court-approved Disclosure Statement and draft plan pursuant to 11 U.S.C. § 1125. The Adequate Protection Agreement is not intended to be and is not a solicitation for votes in favor of or against any plan of reorganization to be proposed in the Reorganization Case but is rather an agreement that, in addition to adequate protection and settlement of the First Lien Claims, provides for incorporation of the Amended and Restated Credit Agreements into a plan. See, e.g., In re California Fidelity, Inc., 198 B.R. 567, 571-72 (9th Cir. B.A.P. 1996) ("The term solicitation as used in § 1125(b) has been narrowly interpreted to mean nothing short of a specific request for an official vote."); Zenter GBV Fund IV v. Vesper, 19 Fed.Appx. 238, 247 (6th Cir. Aug. 29, 2001) (holding the terms "solicit" and "solicitation" must "be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan . . . the terms do not encompass . . . negotiations, or tentative arrangements . . . .") The Adequate Protection Agreement accrues to the mutual benefit of both the Consenting Lenders and the Debtor.

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

- 20 -

1   certain adverse events set forth in the Adequate Protection Agreement ("Termination Events")

2   have not occurred or have not been cured or waived.    Termination Events abrogating the

3   Consenting Lenders' duty to support a Plan include, but are not limited to, the Debtor's failure to:

4   (i) make Adequate Protection Payments; (ii) secure a DIP Loan except in accordance with the

5   terms contemplated by the Adequate Protection Agreement; (iii) file a Plan within the time

6   periods contemplated by the Adequate Protection Agreement, or (iv) expeditiously seek entry of

7   an order approving the Disclosure Statement and Plan confirmation.    Similarly, the Debtor's

8   duties under the Adequate Protection Agreement will terminate in the event the Consenting

9   Lenders breach the Adequate Protection Agreement, and such breach is not cured or waived.

10          Hearing on the Adequate Protection Motion is scheduled for August 19, 2009 at 9:30

11  a.m.

12          D.      Pre Petition Litigation.

13          No legal proceedings were brought against the Debtor by any Creditor or party-in-interest

14  before the bankruptcy filing.[8]

15          E.      Post Petition Litigation.

16          On July 16, 2009, SOLA, Ltd. ("SOLA") filed a Motion for Entry of an Order Directing

17  the Appointment of a Chapter 11 Trustee ("Trustee Motion") [Dkt. No. 113].    The Debtor

18  strenuously denies the unsupported allegations set forth in the Trustee Motion and will

19  vigorously oppose the Motion.    The hearing on the Trustee Motion is set for August 19, 2009,

20  the same day and time as the hearing on the Debtor's Disclosure Statement.

21          F.      Avoidance Actions

22                  1.      Preference Actions

23          A Debtor's estate is granted certain avoidance powers under Bankruptcy Code §§ 544, et.

24  seq.  In particular, payments made to creditors within 90 days of the Petition Date out of the

---

[8] The Debtor initiated the litigation against DRHI and DR Horton and DRHI and DR Horton filed a counterclaim in the action; however, the counterclaim is only against Summerset and is only for an accounting; however, the Debtor is informed and believes that DRHI and/or Horton contend that they have prepetition claims against the Debtor although such alleged claims have never been expressly identified by DRHI and/or Horton.

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

1   Debtor's property on account of a claim may be avoided as a preference under Bankruptcy Code

2   § 547.    November 2005 identified payments made within 90 days of the Petition Date

3   aggregating $600 or more in the answer to question No. 3 in its Statement of Financial Affairs.

4   November 2005 does not believe that any of these transfers are preferences within the meaning

5   of the Bankruptcy Code.

6                    2.        Other Avoidance Actions

7          Bankruptcy Code §§ 544 and 548 allow the avoidance of other transfers, including

8   fraudulent transfers.    The Debtor does not believe that it made any fraudulent transfers to anyone

9   within the meaning of the Bankruptcy Code.

10  **III.        OVERVIEW OF DEBTORS' DEBTS AND CLAIMS**

11         Below is a brief overview of the Debtor's debts and claims.

12  A.       Secured Creditors

13                    1.        First Lien Lenders

14         The First Lien Lenders are members of a syndicate that changes from time to time.    As of

15  the Petition Date, the current First Lien Lenders are identified in Schedule D and the attachment

16  to Schedule D in the Schedules of assets and liabilities filed by the Debtor on May 20, 2009 in

17  the Reorganization Case.

18         Since the inception of the Loans, November 2005 has made principal reductions in the

19  amount due on the First Lien Loans of approximately $179 million.    As of the Petition Date, the

20  balances due under the First Lien Loans (including any unpaid accrued interest and other

21  charges) were as follows:    First Lien Term Loan $101,454,091; and First Lien Revolver

22  $43,321,052.

23         The First Lien Loans are evidenced by the Original First Lien Credit Agreement as

24  supplemented or modified by the First Lien Amendment, the First Lien Waiver, the First

25  Extension Agreement (First Lien), the Second Extension Agreement (First Lien), and the Third

26  Extension Agreement (First Lien) and the other documents executed with respect to the First

27  . . .

28

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

Lien Loan. The First Lien Loans are secured by a first priority security interest in the Debtor's real and personal property.

### 2. Second Lien Lenders

The Second Lien Lenders are members of a syndicate that changes from time to time. As of the Petition Date, the current Second Lien Lenders are identified in Schedule D and the attachment to Schedule D in the Schedules of assets and liabilities filed by the Debtor on May 20, 2009 in the Reorganization Case.

As of the Petition Date, the balance due under the Second Lien Loans (including any unpaid accrued interest and other charges) was $80,597,305.24. The Second Lien Loans are evidenced by the Original Second Lien Credit Agreement as supplemented or modified by the Second Lien Amendment, the Second Lien Waiver, the First Extension Agreement (Second Lien), the Second Extension Agreement (Second Lien) and the Third Extension Agreement (Second Lien) and the other documents executed with respect to the Second Lien Loan. The Second Lien Loans are secured by a junior priority security interest in the Debtor's real and personal property subject to the Intercreditor Agreement.

### B. Priority Creditors

Certain Claims are entitled to priority in bankruptcy cases under Bankruptcy Code § 507. Priority Claims also arise for non-payment of certain taxes under Bankruptcy Code § 507(a)(8). November 2005 is not aware of any priority creditors.

### C. Unsecured Creditors

General Unsecured Claims total approximately $1,684,292. These claims consist largely of unpaid development costs and reimbursement expenses to the City of North Las Vegas in the approximate amount of $221,074. The single largest unsecured creditor is Western States Contracting with an unsecured claim of $1,161,103.

### IV. GENERAL SUMMARY OF PLAN.

The following is a brief overview of the Debtor's proposed Plan. This overview is qualified in its entirety by reference to the specific provisions of the Plan. For a more detailed

- 23 -

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

1   description, refer to the Plan attached as **Exhibit "1."**  As set forth in the proposed Plan,

2   November 2005 proposes to reorganize as follow:

3        On, or before the Effective Date, but after the Confirmation Date, the following

4   transactions will be consummated: (i) the sale of the Transferred Parcels, (ii) the acquisition of

5   the Purchased Loans, and (iii) the execution and delivery of the Amended and Restated Credit

6   Agreements.

7        In connection with the Plan, November 2005 and each of the parties to the applicable

8   Purchase Contract (other than the McCormick Purchase Contract) will amend and restate such

9   Purchase Contracts in their entirety to, among other things, (i) provide that the parcels to be

10  transferred to the SPE's (described below) will be the Transferred Parcels, (ii) provide for the

11  aggregate purchase prices to be paid will be the Transferred Parcels Purchase Price and (iii)

12  provide that the guarantees by the Sponsors under the Purchase Contracts will terminate upon

13  consummation of the sales of the Transferred Parcels. On the Effective Date, the McCormick

14  Purchase Contract will be terminated and of no force and effect.

15       After entry of the Confirmation Order, but before the Effective Date, the Debtor will

16  form the SPE's and transfer the Transferred Parcels to the SPE's.  The SPE's will be limited

17  liability companies and the sole member will be the Debtor.

18       In accordance with the terms of the Amended and Restated Credit Agreements, on the

19  Effective Date, Holding will purchase the Purchased Loans pursuant to the First Lien Lender

20  Loan Purchase Agreements and the Second Lien Lender Loan Purchase Agreements, as

21  applicable, for the Purchased Loans Purchase Price.

22       Prior to the Effective Date, Holding and November 2005 will agree that in consideration

23  of Holding's promise to cancel the Purchased Loans upon the acquisition thereof, November

24  2005 will transfer to Holding (i) all of its interests in the SPE's and (ii) all of its rights and

25  obligations under the Amended and Restated Purchase Contracts.  SPLV,  Olympia NLV

26  Associates, and AWH North will pay Holding, in the aggregate, the Transferred Parcels Purchase

27  Price (less the amount of any deposits previously paid by the purchasers under the Purchase

28

- 24 -

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

Contracts and any credits that such purchasers are entitled to under the terms of the Purchase Contracts) in exchange for Holding's interest in the SPEs. As part of the transaction described above, the First Lien Agent, on behalf of the First Lien Lenders, and the Second Lien Agent, on behalf of the Second Lien Lenders, will release their respective liens on the Transferred Parcels and will release the original members of Holding and their respective affiliates from their obligations under the Purchase Contracts and related consents and agreements.

On the Effective Date, any outstanding amounts under the DIP Loan will automatically be converted into equity of New NLV and (i) the original equity interests in Holding held by the Members will be cancelled without consideration, (ii) in consideration of the conversion of the outstanding DIP Loan amount to equity, plus a contribution equal, in the aggregate, to the funds necessary to fund the Interest and Property Tax Reserve for the Initial Term and the amounts required to cover all transaction expenses incurred in connection with the transactions described in the Amended and Restated Credit Agreements (to the extent not funded from other sources including contributions described in clause (iii) below), NLV 2009 will acquire 97% of the interests in New NLV, and (iii) in consideration of a capital contribution made by each of SPLV, AWH North and Olympia NLV Associates, each of SPLV, AWH North and Olympia NLV Associates will acquire a 1% interest in New NLV.[9]  From and after the Effective Date, New NLV will own 100% of the interests in the Reorganized Debtor and the Reorganized Debtor will continue to own the November 2005 Real Property, excluding the Transferred Parcels sold on the Effective Date as described above. See the organizational chart attached hereto as **Exhibit "3"** for more detail.

. . .

---

[9] The consideration and new equity paid to the Debtor and the Reorganized Debtor by Holding and New NLV will be approximately $45.65 million calculated as follows:  (i) $34 million in net amount of debt cancellation after transfer of the SPEs; (ii) up to $8 million in conversion of the DIP Loan to equity; (iii) at least $3.65 million in cash to be used for certain property closing costs, and operating expenses of the Reorganized Debtor, including certain development costs; and (iv) any additional amounts necessary to fund the interest and property tax reserve as of the Effective Date in accordance with the Amended and Restated Credit Agreements.  Further consideration shall include the approximate $1.1 million prepetition advance made by NLV 2009 to November 2005, which advances were funded by members of NLV 2009.

08159-02/471377_2

QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

In connection with such reorganization, effective as of the Effective Date, each of Summerset, Holding, November 2005, the Members and the sponsors under the Purchase Contracts will release each other from any claims arising prior to the Effective Date pursuant to the operating agreements of November 2005 and Holding and all related agreements, including, without limitation, the Purchase Contracts, but excluding any ongoing obligation of a Member to complete infrastructure development on the parcel(s) it purchased from November 2005 on December 12, 2006 pursuant to the Purchase Contracts.

Simultaneously with the sale of the Transferred Parcels and the equity reorganization described above, on the Effective Date, the Reorganized Debtor will execute and deliver the Amended and Restated Credit Agreements which will amend and restate the First Lien Credit Agreement and the Second Lien Credit Agreement in their entirety. See Article 15 of the Plan for a description of the material terms of the Amended and Restated Credit Agreements. The Amended and Restated Credit Agreements are attached to the Plan as Exhibits "1" and "2". On the Effective Date, Credit Suisse, Cayman Islands Branch, will resign as the First Lien Agent under the First Lien Credit Agreement and will be replaced by a First Lien Agent selected and approved by the First Lien Lenders holding a majority of the First Lien Loans. In addition, as of the Effective Date, the Amended and Restated Credit Agreement (First Lien) will be modified to provide for the right of the First Lien Lenders holding a majority of the First Lien Loans to remove the First Lien Agent pursuant to the terms of the provision set forth on **Exhibit "4"** attached hereto. The consummation of the purchase of the Purchased Loans and the execution and delivery of the Amended and Restated Credit Agreements (as modified pursuant to the previous sentence) on the Effective Date will satisfy the Reorganized Debtor's obligations for treatment of the Allowed First Lien Claims and the Allowed Second Lien Claims.

November 2005 is working with the City of North Las Vegas with respect to amendments to the Development Agreement and other related documents in a manner which will be mutually beneficial and which will take into account the economic and development issues that now exist because of the unprecedented economic climate of today. To the extent that any such

- 26 -

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

agreements have not been reached as of the Effective Date (which is likely), the Debtor intends to enter into a stipulation with the City of North Las Vegas to defer assumption of the Development Agreement until such time as all agreements can be negotiated and approved; provided, however, that the Debtor's treatment of the Development Agreement will comport with the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement or the Amended and Restated Credit Agreements, as applicable. The Plan provides that the Bankruptcy Court will, among other things, specifically retain jurisdiction to approve any assumption of an amended Development Agreement.

On the Effective Date, November 2005 intends to amend and restate certain other development documents, including the IFA, to provide improvements to such agreements given current circumstances and the current economic conditions that exist in the Clark County area. Any such amendments will likely be part of a settlement between Hillwood, as assignee of the rights of DRHI under the IFA and as the transferee of the property which is subject to the IFA. As described above, November 2005 has been in negotiations with Hillwood on the issues related to the IFA and the pending litigation and DRHI's defaults under the IFA and expects to either reach a settlement with DRHI and Hillwood regarding DRHI's right, title and interest under the IFA, its past due payments under the IFA and the related litigation, or the Reorganized Debtor will proceed with such litigation to pursue its claims against DRHI and DR Horton. All claims against DRHI and DR Horton are specifically reserved to the Reorganized Debtor under the Plan. All amendments to the Development Agreement and the IFA will be subject to the applicable provisions of the Amended and Restated Credit Agreements.

A.    Unclassified claims

Administrative Claims, Priority Unsecured Claims and Priority Tax Claims are not classified under the Plan. Administrative Claims are Claims against the Debtor for any costs or expenses of the Reorganization Case allowed under Sections 503(b) and 507(a)(1), including all actual and necessary expenses of preservation of the Estate, Bankruptcy Court fees and Professional Charges for Professionals retained by the Debtor.

- 27 -

All requests for payment of Administrative Claims that accrued during the Administrative Period, including Professional Charges, will be filed and served on the Debtor by the Administrative Bar Date (which is defined under the Plan as 45 days after the Effective Date). Unless Debtor objects to an Administrative Claim, other than the fees and costs of the Debtor's Professionals (the "Professional Fee Claim(s)") that have been previously approved by the Bankruptcy Court), within 45 days after the Administrative Bar Date (unless such objection period is extended by the Bankruptcy Court), such Administrative Claim will be deemed Allowed in the amount requested. If Debtor objects to an Administrative Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Claim. Notwithstanding the foregoing, no request for payment of an Administrative Claim need be filed with respect to an Administrative Claim which is paid or payable in the ordinary course of business. Professionals retained pursuant to an order of the Bankruptcy Court must file applications for Bankruptcy Court approval of their Professional Fee Claims instead of a proof of claim. The Professional Fee Claims are subject to Court approval after notice and hearing upon applications filed within the Administrative Bar Date, and will be paid by the Debtor as ordered by the Bankruptcy Court; provided, that, the Debtor or the Reorganized Debtor must still object to any Professional Fee Claims by the Administrative Bar Date.

Except as specified above, each Allowed Administrative Claim will be paid in cash by the Reorganized Debtor on the later of (i) the Effective Date; or (ii) the date such Administrative Claim becomes an Allowed Administrative Claim, or at such other date and upon such other terms as may be agreed upon by the holder of the Allowed Administrative Claim and the Debtor, or ordered by the Bankruptcy Court.

The holder of every Allowed Priority Unsecured Claim will be paid, in full satisfaction of such Claim, (a) a single Cash payment in the Allowed amount of the Claim on the later of the Effective Date and the applicable Claim Payment Date; or (b) as otherwise agreed in writing by the holder of the Allowed Claim or ordered by the Bankruptcy Court.

. . .

- 28 -

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

The holder of every Allowed Priority Tax Claim, will be paid, in full satisfaction of such Claim pursuant to the provisions of Bankruptcy Code § 1129(a)(9)(C): (a) in deferred Cash payments over a period of five (5) years from the Petition Date, to be paid in equal quarterly installments of principal and interest; (b) the first payment to be made on the first Business Day after the day which is ninety (90) days after the later of the Effective Date or the Claim Payment Date; and (c) each payment thereafter to be paid on the first Business Day of each succeeding quarter until paid in full; provided, however, that the entire unpaid amount of the Allowed Priority Tax Claim, together with any interest accrued thereon, will be paid in full on the date which is five (5) years after the Petition Date; or (d) as otherwise agreed in writing by the holder of the Allowed Claim or ordered by the Bankruptcy Court.

The Debtor does not believe that there are any Priority Unsecured Claims or Priority Tax Claims owing by the Debtor. Therefore, to the extent there are no amounts owing on the Effective Date for any Priority Unsecured Claims and/or any Priority Tax Claims, such treatment as set forth above will be deemed automatically eliminated from the Plan.

B.    Classified Claims

As required by the Bankruptcy Code, the Plan classifies Claims and Membership Interests in various Classes according to their right to priority of payments as provided in the Bankruptcy Code and applicable law. The Plan states whether each class of Claims or Membership Interests is impaired or unimpaired.[10] The Plan provides for the Treatment of each Class of Claims under the Plan. All Claims and Membership Interests are classified under the Plan as stated in the Plan; provided however, that, a Claim or Membership Interest will be deemed classified in a particular Class only to the extent that the Claim or Membership Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of the Claim or Membership Interest qualifies within the description of such different Class. If, at the time of the Confirmation Hearing any Class of

---

[10] Claims are impaired if the Plan in any way alters the legal, equitable, or contractual rights associated with Claims or if the Plan provides for paying less than the full amount of any Allowed Claims.

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

Claims does not contain any Creditor's Claims, such Class will be deemed deleted automatically from the Plan; and any Class of Claims which does not contain an Allowed Claim (or a Claim temporarily or provisionally allowed by the Bankruptcy Court pursuant to Bankruptcy Rule 3018 for voting purposes) will be deemed automatically deleted from the Plan with respect to voting on confirmation of the Plan. To the extent that any Class is not occupied by an Allowed Claim on the Effective Date or the date of distribution pursuant to the terms of the Plan, whichever occurs later, such Class will be automatically deemed deleted from the Plan without any further action by the Debtor, the Reorganized Debtor or the Bankruptcy Court.

For purposes of the Plan, Claims against the Debtor are classified in the following classes in accordance with Bankruptcy Code § 1122(a) as follows:

1.      Class 1-Prepetition Date Secured Tax Claims.[11]

*Treatment*:  All Class 1 Claims, as and when they are Allowed Claims, will be treated as fully Secured Claims and will be paid fully and in Cash as follows:

(a)      In order to compute the Prepetition Date Secured Tax Claims which are the Class 1 Claims, the Property Tax Claims Proration will be conducted as of the Effective Date, if necessary. The Prepetition Date Secured Tax Claims which are Allowed Claims will bear interest from and after the Effective Date until they are paid in full at the rate of three percent (3%) per annum or such other rate as ordered by the Bankruptcy Court.

(b)      The Allowed Class 1 Claims, including interest thereon from and after the Effective Date, will be paid in two (2) equal installments. The first installment will be paid on the first Business Day which is 30 days after the Effective Date or the applicable Claim Payment Date. The second installment will be paid on the first Business Day of the 6th month after the Effective Date or the applicable Claim Payment Date.

---

[11] At this time, the Debtor does not believe that there are any Prepetition Date Secured Tax Claims owing.

- 30 -

SANTORO, DRIGGS, WALCH, KEARNEY, HOLLEY & THOMPSON

SDW

No penalties will be paid on any of the Allowed Class 1 Claims.

Notwithstanding the pendency of any appeal to any state or local taxing authorities of a determination of property taxes or assessment on the Petition Date, nothing contained herein will prohibit the Debtor from exercising its rights pursuant to Bankruptcy Code § 505 and having the Class 1 Claim(s) determined by the Bankruptcy Court to the extent that any Class 1 Claims are Disputed Claims.

Each Creditor holding a Class 1 Allowed Claim will retain its lien(s) on its collateral to the extent of its Class 1 Allowed Secured Claim.

The Reorganized Debtor will pay the Post-Effective Date Secured Tax Claims in the ordinary course of its business operations after the Effective Date. All Property Tax Administrative Claims will be paid as those Claims are provided for Administrative Claims under the Plan.

The Class 1 Prepetition Date Secured Tax Claims are impaired pursuant to the Plan.

2.      Class 2-First Lien Lenders.

*Treatment*: The Class 2 First Lien Lenders Secured Claims, when they are Allowed Claims, will be paid in accordance with the terms of the Amended and Restated Credit Agreement (First Lien), a copy of which is attached as **Exhibit "1"** to the Plan and incorporated therein, provided, however, that the First Lien Agent Prepetition Fees that are Allowed either pursuant to agreement between the First Lien Agent and the Debtor or Allowed by order of the Bankruptcy Court (in the event of a dispute), will be paid in Cash on the later of the Effective Date and the Claim Payment Date .

(a)      With the exception of the Transferred Parcels, the First Lien Lenders will retain their liens on their collateral to the extent of the Class 2 Allowed First Lien Lenders Secured Claims.

(b)      The Class 2 First Lien Lenders Secured Claims are impaired pursuant to the Plan.

SANTORO, DRIGGS, WALCH,
KEARNEY, HOLLEY & THOMPSON

SDW

- 31 -

08159-02/471377_2
QB\135686.00002\8379812.2
QB\135686.00002\8408540.2